Case No. 14-3230 Libertarian Party of Ohio v. John Husted v. Gregory Argument not to exceed 15 minutes for the plaintiff. 15 minutes be shared by the defendant and the intervener. Mr. Brown, you may proceed for the appellant. Before you all begin, Mr. Brown and others, this is Julia Gibbons. I wanted you all to know that while I'm going to be trying to keep time, the clerk who is on the line is also going to be keeping time, so if you hear her interrupting to say your time's up, that means you're supposed to stop just as much as it does if the judge has said you're supposed to stop. Okay? Yes, Your Honor. Okay. All right, you may proceed, Mr. Brown. Good afternoon, and may it please the court. We have three issues here, Your Honor. The first issue is whether Ohio's employer statement statute, which is 3501.38E1, facially violates the First Amendment to the United States. The second issue is whether the Ohio Supreme Court's recent construction of this statute, which expands it to include all financial sources, can, consistent with both the First Amendment and the Fourteenth Amendment due process clause, be given retroactive effect. The third issue, Your Honors, is whether the Secretary's new enforcement policy can, consistent with the First Amendment and the Fourteenth Amendment due process clause, be given retroactive effect. This case, Your Honors, has, I should say the Libertarian Party's ballot access efforts have a long history, and this case, too, has its own long history. In 2006, this court and Libertarian Party of Ohio against Blackwell invalidated Ohio's ballot access statute and effectively gave the Libertarian Party ballot access. Since 2006, the state of Ohio has on at least two occasions, and actually most recently with SB193, a third occasion, tried to create a constitutional ballot access mechanism. All of those efforts have been invalidated. The most recent effort, SB193, which was part of this case at its, well, not at its inception, but closer to its inception, wasn't joined by Judge Watson below. Judge Watson said that the new statute could not be retroactively applied to the Libertarian Party of Ohio. That decision came down January 8th of this year, and although we were very grateful with the decision, it also left the Libertarian Party of Ohio in something of a bind, because the signatures required of its candidates to qualify for the May 6th primary were due the first week of February, which left us with only one month to collect signatures. The worst month to collect signatures, your honors. January in Ohio is not commonly pretty, and this was the worst one in probably 50 years. For that reason, the Libertarian Party of Ohio invested pretty much its entire bank account and paid circulators to gather the signatures for candidates. Two of the candidates in particular, Charlie Earle and Stephen Lineberry. Mr. Earle is a party to this case. Mr. Lineberry is not. They used a common circulator. His name was Oscar Hatchett. And Mr. Hatchett collected, I think, several hundred signatures for Mr. Earle. Mr. Earle was certified for the ballot using Mr. Hatchett's signatures and signatures supplied by volunteers. He was certified. I'm sorry? Mr. Brown, I wonder, this is Judge Cook asking whether or not, I mean, I think the panel is aware of the history, but you get to the point where Mr. Hatchett caused the problem here by failing to complete the employer's statement about his compensation. Is it correct, my reading of the brief, that he offered, he realized that he had not completed that and offered to drive to Columbus to cure that problem and was dissuaded from doing that? No, Your Honor, that's not correct. Mr. Bob Bridges, who is the political director, I'm sorry? Right, I saw that. Bob Bridges supposedly told him not to bother. That's not true, Your Honor. But what happens, if you read the transcript before Professor Smith, the administrative hearing officer, Bob Bridges was told by Oscar Hatchett, Oscar Hatchett said, I've been doing this my whole life, and I have never filled out that employer's statement. I'm an independent contractor. I don't have to. Mr. Bridges' response was, okay. Mr. Bridges did not tell him not to fill out that employer's statement. In our reply brief, I include some of the relevant testimony that Mr. Bridges and Mr. Hatchett both provided to the administrative hearing officer. And I think that testimony makes that clear. Well, however you characterize it, it is fair to say that it was called to the attention of a representative of the Libertarian Party that the form was incomplete in that respect, correct? Yes, Mr. Hatchett did say to Mr. Bridges, I'm not filling out this employer's statement because I've never done it before. Yes. That, of course, gives rise to our due process. One of our due process concerns here, Your Honor. Mr. Hatchett has circulated, testified before the administrative hearing officer, that he has circulated signatures for 10, 12 years in Ohio. Since 2006, when the employer's statement went into effect, he said he circulated thousands of part petitions. And he's never filled it out. And he's never had a problem. His understanding, he said, was that as an independent contractor, he did not have to fill that out. And his understanding, we argue, is reasonable because the Secretary has never enforced that statute until today. There is no evidence. Mr. Damschroder, the Secretary's expert at the hearing, testified that there is no evidence of it ever being enforced, period. There are two directives that were issued by the Brown, what would your argument be in response to the other side taking the position that the onus is on the law violator in taking the risk to say, well, it was never enforced? The risk that it would be enforced because it's a law that's enforceable, what's your response to that? That's likely the argument. Our response to that is the Fox case the Supreme Court handed down just a couple of years ago. Very, very similar. The FCC had on its books a regulation prohibiting the use of vulgarity, profanity on the air. That was the rule. But its internal policy was not to enforce it for fleeting expletives. And then, of course, you get, I think it was Bono or somebody else who may share, who used curse words on the air, and all of a sudden the FCC came down on the networks for that. The FCC simply changed its own policy, its own enforcement policy. On due process, it gave relief on due process grounds? Yes, Your Honor, exactly. It was due process. But in that case, the court said due process more carefully applied because it was a First Amendment setting. In a First Amendment setting, the due process anti-retroactive principle is even stronger, Your Honor. Why doesn't Section 3501.39 of the Ohio Revised Code give notice that if a protest is filed, then a whole different discussion or procedure about enforcement follows? Well, I think that statute, Your Honor, just creates another mechanism to enforce the rules. I don't think it puts our clients on notice that the Secretary's non-enforcement policy might all of a sudden pop up. Well, it certainly puts you on notice if a protest is filed, there's a chance of enforcement that might not occur in the absence of a protest, correct? No, Your Honor, I don't agree. The Secretary had issued at least two directives, Directive 2006-58, 2007-14, to the election boards that say, Do not invalidate if blank or incomplete does not match information provided in the compensation statement or is otherwise improperly filled out. Do not invalidate the part petitions for incorrect employer statements. Given those directives, I think a reasonable person would conclude that regardless of who files the claim, whether it's a protester or it's a local election board or it's the Secretary himself, it's just not going to be enforced. Does the Secretary have any discretion about what remedy to apply here once the violation was determined to have occurred? Not to my knowledge, Your Honor. Instead, the statute does say that if the employer statement or a number of other requirements are not properly completed, then the part petition is invalid. I do not believe the Secretary has any discretion in that regard. Of course, Your Honor, our best argument is the First Amendment argument, the facial challenge, because there's no precedent supporting what Ohio does. We cited in our briefs 11 cases that invalidate laws that either require the disclosure of the paid circulator's name or the funding source's identity. The cases are across the board in favor of the First Amendment. There's no support at all for the Ohio law. In fact, no other state, to my knowledge, has such a law. It clearly violates the First Amendment. I've been watching my time, Your Honor. I've run into 11 minutes. I wanted to save five minutes for rebuttal. Let me add one thing on the First Amendment point. The extent that CHIL is an evidentiary question, I want to make sure that I have described accurately what's in the record on that point. There is the Michael affidavit, which was filed. It's not referred to by the district court, but it was filed in the district court. There is a fleeting reference by Mr. Hatchett that someone tries to argue has to do with it. And then there is the evidence that comes from the witness to whom the district court referred in its opinion, whose name escapes me for the moment. Is there anything else? Socialist Workers Party, there's the McIntyre... I'm asking you about evidence in the record. I'm not asking you about case law. The question goes to the evidence in this record. Well, Your Honor, I think that in the verified complaints filed by Earle, by Kevin Medler, and by Aaron Harris, there are statements that they are severely burdened. Charlie Earle is severely burdened because he's been kicked off the ballot. But he's not a circulator. He's not an injury to them. But if we're talking about chill arising from the existence of the requirement, we're talking really about the circulators, correct? That's correct, Your Honor. And the evidence with respect to the circulators, is it anything different from what I outlined for you? Presented before the district court? No, Your Honor. But we're making a facial challenge, Your Honor. I understand that. I just asked you about it. I'm sorry, Your Honor. You're correct. All right. You'll have your rebuttal time. I understand. Next we'll hear from Ms. Coontz. Yes, thank you, Your Honor. May it please the court. The court's questions go directly to the issue in this case, which is the lack of evidence of NHL to support plaintiff's facial challenge. Plaintiffs have the burden of proving that Ohio's disclosure law significantly burdens First Amendment rights. And they simply haven't presented any evidence to that effect. They've presented hypotheticals about ways in which it could be unconstitutionally applied, but that's insufficient to carry their burden. They attempt to rely on Brown v. Socialist Workers Party, as plaintiff's counsel just indicated. Where the U.S. Supreme Court held the minor parties could be exempt from compelled disclosure if disclosure would subject them to harassment or reprisals. But two important points need to be made about that case. Number one, it was an as-applied challenge. It was an attempt to strike down a disclosure law in all applications as we have here. And number two, the plaintiffs presented actual evidence about harassment to support their claim. They presented evidence that they received threatening phone calls, hate mail, and they were fired. All because of their disclosure of their affiliation with the Socialist Workers Party. We simply don't have any evidence to that effect in this case. And this case instead is more like Madigan, where again, plaintiffs made the exact same arguments as we have here. That they have an interest in anonymity and a prospect of retaliation that outweighs the state's interest. But just as here, the Madigan plaintiffs presented no evidence to that effect and the court rejected their claim. And we can't lose sight of the facts that are before this court. The funding source circulator that we're talking about here is the LPO. LPO paid Oscar Hatchett to circulate petitions. We're not talking about a funding source who is concerned with anonymity. In fact, LPO disclosed the fact that they paid Oscar Hatchett on a campaign finance report. Second, to the extent that plaintiffs are attempting to vindicate someone else's First Amendment rights, there's no evidence in the record that anyone thought that it was risky to associate with the LPO. Or that they would suffer any sort of harassment or reprisal. Instead, at the protest hearing, it was apparent that both Ian James and Oscar Hatchett actively sought to circulate petitions for the LPO. The plaintiffs theorize that the disclosure requirement will chill First Amendment speech, but have offered absolutely no evidence that it does. The evidence to which the court referred, the Frankel Affidavit, there's no indication that Mr. Frankel's ever circulated petitions in Ohio or at all faced any harassment or reprisals in Ohio or is aware of the process here in this state. The court's reference to Mr. Linnau, Mr. Linnau testified that he did not fear any sort of reprisal, as the district court stated, and the district court gave credence to Mr. Linnau's testimony. That testimony is unrefuted. In this case, we're talking about a disclosure requirement. And as the court said in Madigan and Buckley, disclosure requirements do not put a ceiling on speech or prevent anyone from speaking. Cases in which disclosure laws have been struck down in either an as-applied or a facial challenge relied on actual evidence that the law burdens First Amendment activity in some manner, and we simply have no evidence to that effect here. The plaintiffs are simply speculating as to how the disclosure law would burden parties' rights, and they're asking the court to do the same. But this isn't enough. They fail to carry their burden of demonstrating a realistic danger to anyone's First Amendment rights, and the district court's ruling rejecting their request for a preliminary injunction should be upheld. The plaintiffs also referenced this new enforcement policy of the Secretary of State, and that's simply not correct. As the Evans and the Rothenberg case indicate, the Secretary of State has enforced the disclosure requirement in the context of protest. This is not a new application of Ohio's application of 350138E1. This is the exact same interpretation that the Secretary has previously employed. Plaintiffs argue that Hatchett reasonably relied on his experience as a professional circulator, not that he reasonably relied on the law, but Hatchett was wrong. We're not retroactively applying a new interpretation of 350138E1 that didn't previously apply before the Lineberry decision. The Lineberry decision didn't change anything. Once again, as the district court noted, no court has ever interpreted the disclosure law to exempt independent contractors. The Evans court didn't, and the Rothenberg court did not either. And the Secretary is not obligated to apply a plaintiff's incorrect interpretation of the law simply because the Ohio Supreme Court just recently told the plaintiffs that they're wrong. This is also not an issue of retroactive enforcement. Plaintiffs can't say they didn't know that Ohio's disclosure law would be enforced, because again, they cite Evans and Rothenberg, which are two cases in which it actually was enforced. So if the issue is that they're simply saying that they didn't think they were going to get caught in an enforcement proceeding, that's insufficient. The law is not unconstitutionally vague simply because they thought that they wouldn't get away with violating it. With respect to plaintiffs... Ms. Coon, so Dan Schroeder's affidavit, or I mean his deposition testimony, confirms that, at least as far as he knew, that it had never been prior enforcement. Correct. He testified that it had been previously enforced in the context of protest. Yes, that is correct. This is a statute that the Secretary enforces upon the filing of a protest. And as he testified, that's simply a resource issue. The Secretary of State... This is just one of the many election laws that the Secretary was responsible for carrying out, and he testified that the Secretary of State would not have the resources to investigate every single part petition that's submitted to the office. Remember, these are part petitions, so some may have three signatures and some may have 300. In the 2014 primary election, the Secretary of State received over 3,500 part petitions. For the proposed constitutional amendment on redistricting in 2012, it received 60,000. So for the Secretary to investigate every single part petition would simply be impossible, and they simply don't have the resources to do so, and that's not what the law requires. It instead errs on the side of presuming that petitions are correctly filled out, which actually allows for more ballot access. And plaintiffs' claim with respect to the enforcement seems to go more to their selective enforcement claim, which is in their Third Amendment complaint that they've sought leave to file and were waiting for a decision from the district court. The state has an interest in requiring disclosure, and this court recognized that in Dieter's that eliminating election fraud is a compelling state interest. And we know from Buckley that a state can require the sponsors of a ballot initiative petition to disclose who pays petition circulators. And this is important because, as the Buckley court recognized, that risk of quid pro quo is less in the ballot initiative context than it is here in the context of candidate petitions. And that's the quid pro quo and the opportunity for fraud that Ohio's disclosure laws are aimed to combat. And as the district court found in this case, Ohio's disclosure laws were passed in response to actual fraud, and plaintiffs don't claim that this finding is clearly erroneous and it should stand. And Mr. Damsroder's testimony in this case demonstrates the connection between this law and its stated purpose. He testified that the employer disclosure requirement, and specifically the box on the petition, serves a number of purposes. It deters and prevents fraud, and it allows fraud to be detected. And he explained how the employer box could be used to serve that purpose and the information on it. It could be a disincentive. If a circulator or a funder knows that the secretary has the ability to potentially track them down in the case of fraud, it may deter fraud in the circulation. Again, it aids investigations. It gives the secretary the ability to track down circulators if any questions arise with respect to petitions. And plaintiffs did not refute this evidence or offer any evidence to the contrary. Ohio has an interest in deterring, detecting, and preventing fraud, and plaintiffs simply haven't proven that the disclosure laws severely burden anyone's First Amendment rights, such that that interest is outweighed. So the secretary would respectfully request the district court's decision be upheld and the preliminary injunction denied. Thank you. Ms. Koontz, can I ask you one question? Sure. I'm hoping I can articulate this correctly. Okay. We're talking, or at least I can adequately communicate it. We're talking here about the constitutional rights of the circulators, and we're talking about CHIL on their exercise of those rights. But we also come to a point where we're talking about the impact on the constitutional, the rights of association of the members of the Libertarian Party and their rights in the political process. Where do we put the Libertarian Party's interest into the analysis on the claims that are asserted? Well, I mean, clearly it goes to the extent of the harm, but other than that, where do we put it? Well, it's certainly not a First Amendment right automatic ballot access. So the question becomes, does this circulator disclosure requirement impact their associational rights or their ability to associate with other members of their party or other people that share their beliefs? And there simply isn't any evidence in this case that that is, in fact, the situation. They haven't demonstrated that this presents any burden to their associational rights. Well, certainly they're severely burdened by being removed from the ballot. They are burdened by being removed from the ballot, but that's the harm that they suffer as a result of the enforcement of the law. But that doesn't mean that the law itself is unconstitutional. So your position is that the only way that really matters in the overall analysis is in assessing the harm. It's really a case about the Libertarian Party's assertion of the rights of circulators. Is that right? Yes. Okay. I think you were finished, I think, right? I was, Your Honor. Thank you. Okay. Mr. Tigges, is that the correct pronunciation? It is, Your Honor. Thank you. May it please the court. It's my privilege to represent the intervening defendant, Mr. Felsosi. Four separate times, Your Honors, the district court made specific factual findings in the court's decision to the effect that the disclosure requirement of this statute does not chill or burden political speech. The district court even went so far as to find that this disclosure requirement did not burden plaintiff's political speech in any meaningful way. Those were the words that Judge Watson used. These findings of fact, as we all know, are reviewable only for clear error, and we would submit that on this record there is no basis to find clear error or reverse the court's findings. Ms. Koontz has already pointed out the lack of evidence of chill or burden that plaintiffs submitted. What I'd like to do is focus for a moment on the other side of that coin, on the evidence in this record of the fact that this statute does not impose a significant burden on persons collecting signatures or the persons employing them. We start with testimony of Mr. Damschroder, the current Director of Elections for the State of Ohio. Mr. Damschroder testified that in his experience he is not aware of any instance where compliance with this disclosure requirement caused any problem to circulators or their employers from having to fill out the little box on the form. He has never received any complaints to that effect. We also had the testimony of Dana Walsh, who was Mr. Damschroder's predecessor as the Director of Elections for the State of Ohio, as well as the legislative liaison for this statute when it was adopted by the General Assembly. His testimony was to the same effect. He is not aware of any problems it has ever caused. As we know from Judge Watson's decision, the District Court specifically credited repeatedly the testimony of Brandon Leinow. He's an active political consultant in the State of Ohio. He's run nine statewide petition campaigns and collected more than one million signatures. Mr. Leinow is similarly not aware of any instance where having to comply with this disclosure requirement imposes any impediment to collectors collecting signatures or has resulted in collectors being subjected to any kind of harassment or reprisals or threats or anything of that sort. Indeed, Mr. Leinow testified that in today's political climate, both collectors, circulators, and the persons employing them value disclosure and transparency over anonymity in the case of the circulators because they want their good work to be known to others who might employ them in the future and thereby benefit them. We also have in this record the testimony of Ian James and the four circulators who worked for him. They all had no problem in completing the disclosure box when they collected signatures for Mr. Earle. Judge Cook, you asked about Mr. Hatchett's testimony and there was a bit of a disagreement by Mr. Brown as to what he actually said, but I have his testimony, the actual transcript opened at pages 96 and 97 where he was asked these questions and gave these answers, Judge Cook. Question. So you decided you would leave it to Mr. Bridges, that's the LPO political officer, leave it to Mr. Bridges to determine whether you needed to fill out the box and you would be available to come to Columbus to fill out the box if he requested? Mr. Hatchett's answer, yes. Question. So you were prepared to do whatever the Libertarian Party told you to do in terms of filling the box? Answer. Well, I wanted my signatures to count. Question. So the answer is yes, Mr. Hatchett? Yeah. But Mr. Hatchett plainly expressed his willingness to have completed this box. It was not a problem for him because, as he said, he wanted his signatures to count. That's how he got paid. And lastly, we have the testimony of Robert Bridges, the LPO's political officer. He admitted he could have completed the box, as Judge Watson found at page 23 of his decision. It would have been relatively simple for Mr. Bridges to have caused the box to be completed either by Mr. Hatchett or by himself. Mr. Bridges testified he chose not to do so. As Judge Watson found, it was a self-inflicted wound. Judge Gibbons, you asked earlier of Ms. Coons how the LPO's rights fit into this, and I would respectfully submit they fit in where the evidence puts them, and the evidence that they presented showed no burden or chill on their rights or the rights of their circulators. So based on this record, it is overwhelmingly one-sided. There has been no meaningful burden on the plaintiff's political speech or on anyone else's, and we respectfully submit that the judgment should be affirmed for that reason. Thank you, Your Honor. Okay. We'll hear from Mr. Brown in rebuttal.  Judge Watson's fundamental mistake was precluding us from making a facial challenge. He did not accept our facial challenge. That is wrong as a matter of law. The United States Supreme Court made clear in the Citizens United case that facial challenges, in particular in the context of elections where time is of the essence, are preferred. They are preferred, as the Supreme Court made clear in Citizens United, because in the run-up to an election where you're talking about weeks, challengers, First Amendment speakers, circulators, candidates, parties, don't have time to make as-applied challenges. And that's our problem here, Your Honor. We just do not have the means to do that. You know, making a facial challenge does not necessarily mean that there are some facial challenges that are not accompanied by an evidentiary record. But evidence that is presented through the evidentiary record is as relevant to the facial challenge as it is to the as-applied challenge, correct? Yes, Your Honor. And so you're not arguing that Judge Watson, in some way, in assessing the evidence that was presented to him, that he was in error in that respect, were you? No, we're not, Your Honor. We're not challenging his factual findings. Our point is, Your Honor, that in a facial challenge like this, the party, the candidate, Mr. Earle, has a constitutional First Amendment right to be judged under a constitutional statute. That gives rise to the question of whether this statute is constitutional. That question, Mr. Brown, is judged by the First Amendment harm to the circulators, not by the harm to the Libertarian Party of being excluded from the ballot. Is that correct? Partly. But it's both, Your Honor. It's the harm caused to the circulator and the harm caused to the candidate at the party. The Nader v. Blackwell case makes that clear, Your Honor. In the Nader v. Blackwell case, Ralph Nader challenged Ohio's law that required residents of circulators. This court ruled in Nader's favor. It ruled that the law was a violation of the First Amendment. And at least two of the judges there found that it was a facial violation of the First Amendment. And importantly there, Your Honor, there was absolutely no proof introduced in that case that any circulator was severely burdened. There was no proof, Your Honor. We don't have to make that proof. There are a number of cases, like the McIntyre case, which came out of Ohio, where Ohio required that leafleters disclose either their identity or the funding source's identity on the leaflet. But there was no proof in that case that any particular leafleter was severely burdened. The Talley v. California case in 1960 was a facial challenge, much like McIntyre, which required that leafleters put their names on leaflets. There was no finding in that. Could I interrupt you, Mr. Brown? Yes, please. I think that you can discern from the questioning of the panel that the bigger question here is whether or not there's any evidence of burdening or chill. You know, what evidence exists to support that? That's what we're having trouble with. We have the affidavit, but what more is there to show, particularly in light of the presumption of constitutionality, is that even in play here? It would seem from your argument that you would say it's not. No, it's not, Your Honor. There is generally a presumption of constitutionality, but not when a law burdens a fundamental right. Then the presumption goes the other way, and the burden's on the state to justify the infringement. Right. And which still argues the point whether this is a burden. Well, Your Honor, just another example. In National Labor Relations Board against Midland Daily News, this court in 1998, it was one newspaper who was being, the NLRB wanted its advertiser's name, it was an anonymous ad, and this court said, without finding whether the Midland, the newspaper itself, was severely burdened, the court said we can't order that because, quote-unquote, the chilling effect on the ability of every newspaper and periodical to publish lawful advertisements would clearly violate the Constitution. So in facial challenges, Your Honor, courts abrogate. You can look at the ramifications across the country. This court did it in Nader against Blackwell with circulators. It did it in the Midland case with advertisers. We don't have to put a circulator on the stand who says, I'm burdened. Well, in order to succeed on a facial challenge, you might not have to present any evidence at all, but the question we are presented with is, you know, when evidence is presented, it's a little hard to make the argument that the cases that you have cited endorse ignoring it. No, Your Honor, I'm sorry. I don't mean to argue to ignore that testimony. I think some of the testimony is good for our side, some of it's good for their side. But what I'm saying is that testimony is much, much, much more relevant to an as-applied challenge. It's not nearly as important in a facial challenge. Just one more point, if I may. I know I'm running along here. I'm sorry, Your Honor. The Secretary argued that Damschroder testified that the employer statement had been enforced in protest hearings, and he did not testify to that. Instead, Damschroder said that the employer statement had never been enforced at all, period, whether it was by the Secretary himself or through any protest. It just never happened before. As far as Mr. Tigges' argument about Bob Bridges and his conversation with Oscar Hatchett, he has selectively picked some quotes out of the transcript. There are other quotes which prove the opposite. For example, Bridges testified that he had no conversation with Hatchett. This is at the record 63-1, page 1293. Bridges testified that he did not tell Hatchett what to do. This is on the same page, 1293. Hatchett testified, you guys aren't my employer, quote-unquote. So I don't fill it out, quote-unquote. That's on page 1326. Again, Your Honor, the LPO was simply following the advice of an experienced circulator. The LPO is a shoestring operation. It doesn't have employees. It doesn't have the resources to have an attorney on staff. It just doesn't. So it depends. It's a grassroots organization. Anyway, Your Honor, thank you very much for your time. Okay. We appreciate very much the argument that you all have given, and we will consider the case carefully. And we're very aware that it is time-sensitive, and we'll be keeping that in mind as we attempt to resolve it. Judge Gibbons, do you want the attorneys to stay on the line and we'll put them in a separate sub-conference? Yes. Okay. Brandon? Yes, ma'am. You would like me to place the attorneys on hold at this time, is that correct? Yes, just put them in a separate sub-conference. I guess you can give them music again like you did earlier. Yes, ma'am. And then just let us know when they're off the line. Judge Gibbons? Yes. The attorneys are now in their own sub-conference. Okay. Judge Gibbons, I'm going to have Brandon place me in a separate sub-conference, but I did not mention to you earlier, while you all are talking, when you need to get Brandon back so he can either get me back to you or you can let me know whether we need the attorneys or not, you'll need to press star zero. So when he puts you in a separate sub-conference, for you to get him back so he's not listening into your conversation, hit star zero on your phone and he'll come back into your conference. Okay. All right. All right. Brandon, if you could separate us, I'll get in a separate sub-conference and just let the judges know when they're alone. Okay. One second. Thank you.